Totten, J.,
delivered the opinion of the court.
By the will of Wm. Lindsey, certain legacies were given *479 in trust for the use of his son, Thomas Lindsey and his wife, and the survivor of them, during the life of the survivor, and at the death of said tenants for life, the said legacies are given to their lawful children, or in case of their death, or the death of any of them, “ to their lawful offspring.” If the wife of Thomas Lindsey should survive him, and again marry, that fact was to terminate her interest in the legacies. The plaintiff became the trustee, and took possession of the money fund. These transactions occurred in Prince Edward county, Virginia, where the parties resided. On the 17th June, 1844, an order of court was there made, that the trustee should invest said funds in the purchase of a negro woman for the use of said beneficiaries, taking the title to himself, in trust, for their use.
After this, the plaintiff placed in possession of Thomas Lindsey, a negro woman, Emma and her two children, Maria and Charlton, of the value of six hundred dollars; being a greater sum than the amount of the trust fund ; but with the understanding that said Lindsey’s family should have the use of these slaves, and in case of an addition to the trust fund, which was expected, they were to be conveyed, in trust, for the use of the family. No absolute sale or any conveyance was ever made. In November, 1845, the plaintiff caused said slaves to be taken out of the possession of said Thomas Lindsey, being apprehensive that he was about to remove them; but his assent, on receiving strong assurances to the contrary, restored the slaves back to the possession of said Thomas Lindsey, who immediately afterwards, and in the night, ran off with the slaves, and came with them to Smith county, Tennessee, except the slave Maria, whe, it seems, he sold on the way. Thomas Lindsey died in 1846, in the county of Smith, and his wife administered on his estate. The administrator procured an order of court to sell the slave, Emma, and her infant child, Archer, and they were sold at public auction to *480 defendant Smith, on the 16th January, 1847, for $415, which went to the assets of the estate. On the 29th Jur e, 1847, said Susanah Lindsey and her son Granville Lindsey, and her son-in-law Walker Hooker, sold to defendant Tinslsy the other slave Charlton for $210, and covenanted with him to pefect his title, by procui'ing the conveyance of the other children interested in the slaves, as recited in the covenant, as they should arrive at age.
This suit was instituted by the plaintiff, to recover the possession of said slaves on the 13th February, 1847. The defendants have filed cross-bills, in which they pray, that in case they have no title to said slaves, the trust fund in plaintiff’s hands be decreed to them for indemnity, to the extent of the interest of those children of said Thomas Lindsey, who are of age, and who, it is said, concurred in said sales; three of said children are yet minors.
The chancellor dismissed the plaintiff’s bill, and he has appealed in error to this court.
The defendants’ counsel object to the jurisdiction of the court of chancery in the present case upon two grounds ; first, as a sale of the slaves was intended, the plaintiff is not entitled to the peculiar relief given by that court, but that a compensation in damages should be considered an adequate remedy ; and, second, if that were not so, yet the action of replevin, under the provisions of the act of 1846, ch. 65, now affords an adoquate and efficient remedy at law, to restore the slaves back to the possession of the plaintiff.
The remedial power of a court of equity to decree the delivery of specific chattels, is limited to a class of cases where the chattel has a special and peculiar value, and where the remedy at law, in damages, would be entirely inadequate; as, where the chattel is a family relic, or ornament, or heirloom, or other thing of kindred nature. This is an original and well settled jurisdiction of the court, in which its remedial *481 justice is administered by the process of injunction, ordering a specific delivery of the chattel to the rightful owner. 2 Story’s Eq. Jur., sec. 708.
Now, this principle has been applied to slaves as a property of special and peculiar value, for the recovery of which, the owner is entitled to this higher and more perfect remedy, as a compensation in damages would be utterly inadequate and unsatisfactory to the rightful owner. It is, however, a well settled rule, that to entitle the party to this special relief, his title to the slave or other chattel, where the principle applies, must not be doubtful, but clear and indisputable.
It was intimated in some of the early cases, that the principle did not apply to slaves generally, but applied only where it appeared that they were of special value to the owner, as family servants, for which he had special regard; and, therefore, in the pleadings, we frequently see averments to this effect. This modification of the principle would seem to require that the owner of the slave should aver and prove a case of special value, to entitle himself to this special and peculiar remedy. Such, however, has never been the practice; but, assuming that slaves are of special and peculiar value to the owner, the jurisdiction is made to depend upon the relation of master and slave, and the clear and unquestionable character of the plaintiff’s title. Henderson vs. Vaulx & Wife, 10 Yerg. R., 37; Loftin vs. Espy, 4 Yerg. R., 91; Saunders vs. Woods, 5 Yerg. R., 142; Bryan vs. Earthman, 6 Yerg. R., 25; Prewitt vs. Loony, 8 Yerg. R., 66.
Now, the plaintiff has shown a clear and valid title to the slaves, and Thomas Lindsey, under whom defendants claim, was a mere bailee of the slaves, without any title or color of title.
As to the remedy at law, it is true, that the action of re-plevin is now, in most cases, an adequate and efficient remedy to restore the possession of the slave to the rightful owner; *482 but it is equally true, that this remedy at law, given by statute, does not take away the original and independent jurisdiction of the courts of equity on the same subject, which they had before rightfully exercised. “ The jurisdiction of equity,” says Mr. Story, “ like that of law, must be of a permanent and fixed character. There can be no ebb or flow of jurisdiction, dependent upon external changes. Being once vested legitimately in the court, it must remain there, until the Legislature shall abolish or limit it; for, without some positive act, the jnst inference is, that the legislative pleasure is, that the jurisdiction shall remain upon its old foundation.” 1 Story’s Eq. Jur., sec. 64. (i.)
We therefore conclude that no valid objection, upon either ground, can be taken to the jurisdiction of the court, and proceed to the consideration of the other defence relied upon by counsel.
The defendants insist that they are purchasers bona fide, without notice oí the plaintiff’s title. They claim under the assumed title of Thomas Lindsey, and we have seen that he was not only without any valid title, but without color or semblance of title. Both the legal and equitable title were in the plaintiff, and we have seen that the slaves were fraudulently and secretly removed from Virginia to Tennessee, where the defendants purchased without any connivance or negligence on the part of the plaintiff. Thomas Lindsey must be considered as a mere bailee of the slaves, without any authority to remove them from Prince Edward county, Virginia; but, on the contrary, under express injunctions not to remove them. It is this circumstance alone that mitigates his act from felony to fraud. Now, the defendants say that they had no notice of this transaction, or of the plaintiff’s title, and that they purchased and paid the money, in full confidence that the title of said Thomas Lindsey was good and valid. We do not deem it material to raise any question of diligence against the *483 defendants; but to say the least of it, the plaintiff has been equally diligent and equally innocent as they; and having the legal title and equal equity, is unquestionably entitled to a recovery.
The purchasers must hold a legal title, or the right to demand it, in order to give them the full protection of the de-fence relied upon; for if their title be merely equitable, they must yield it to the superior legal and equitable title of the plaintiff. Story Eq. Jur. sec. 64, ch. and sec. 1502. In the last place, the defendants insist, that as the purchase money for said slave went to the payment of the debts, and to the use of the family of said Thomas Lindsey, the defendants are entitled in equity and conscience to be refunded out of the trust funds of said beneficiaries in the hands of the plaintiff as their trustee; and if not to the entire amount, at least to the extent of the interest of such of said beneficiaries as were of age and concurred in the fraudulent sale of slaves to which they had no title. To effect this object, the defendants have filed their cross-bills in this suit.
However much inclined to take this view of the case, so consonant to reason and justice, yet, upon legal principles, we are constrained to take a different view of the subject.
In Satterfield vs. Mayes, at Knoxville, 1850, a will contained the following clause: "I lend to my daughter, Betty Mayes, one negro girl, named Lettice, during her natural life, and after death, she and her increase to be equally divided between her daughters.”
Upon the construction of this clause, McKinney, J., delivering the opinion of the court, said, “The rule is well settled, that where a bequest is made to a class of persons, subject to fluctuation, by increase or diminution of its number, in consequence of future births or deaths, and the time of payment or distribution of the fund is fixed at a subsequent period, or on the happening of a future event, the entire interest vests in *484 such persons ouly, as at that time fall within the description of persons or constitute such class.” And reference is made to Jarmon on Wills, vol. 1, 295; 1 Roper on Legacies, 71, &c.
Now, it will be seen, that the present case falls precisely within this principle. At the death of Thomas Lindsey and his -wife, or if the wife survive, then at her second marriage, if that event should occur, the fund is to be equally divided amongst their children. The legacy in remainder is to a class, and those living when it shall vest in possession, will be entitled to receive it to the exclusion of the representatives of any that may have previously died, without issue, because it will be seen, that by the terms of the legacy, such issue as may then be living will be entitled to an interest in the fund, not in their representative character, but in their own right, as legatees under the will. It follows, therefore, that the children now of age, have no present interest in the fund of a fixed and permanent character, and which could be affected by decree; because in case of the death of any of them, before the remainder shall vest in possession, their interest would go to the survivors.
The decree of the Chancellor will be reversed, the cross-bill dismissed, and decree made for the plaintiff, ordering the slaves to be delivered, &c.